757 So.2d 403 (2000)
Donovan WYATT
v.
BELLSOUTH, INC., et al.
1980927.
Supreme Court of Alabama.
January 21, 2000.
David L. Yewell of Kamuf, Yewell, Pace & Condon, Owensboro, Kentucky; and Griffin Sikes, Jr., Montgomery, for appellant.
Walter R. Byars of Steiner-Crum, Byars & Main, P.C., Montgomery; Jeffrey E. Holmes of Lange, Simpson, Robinson & Somerville, Birmingham; and Robert E. Thomas of BellSouth Telecommunications, Inc., Atlanta, Georgia, for appellees.
LYONS, Justice.
The United States District Court for the Middle District of Alabama has certified to this Court the following questions, pursuant to Rule 18, Ala. R.App. P.:

*404 "(1) Under Alabama law, may a terminated at-will employee who prevails on a promissory estoppel claim which does not alter his at-will status recover lost wages and benefits for the period after the termination of his employment?
"(2) Under Alabama law, may a terminated at-will employee who prevails on a promissory estoppel claim which does not alter his at-will status recover damages for mental anguish arising from the termination of his employment?"

I.
The district court described the facts as follows:
"The plaintiff, Donovan Wyatt, was first employed by BellSouth (`BSC') in a craft position in 1962. In 1969, he was promoted to management and enjoyed a successful career. He was frequently rewarded for his performance. Prior to the move to Montgomery which is the genesis of this lawsuit, Wyatt was well thought of and considered to be a top performer. In 1991, the Montgomery district was considered by upper level management in BSC to be a weak operation. According to the deposition testimony of T.L. Cloar, the BSC upper level manager with responsibility for Alabama, the Montgomery operation had serious problems and management felt that they needed to `be addressed with strong leadership and with someone who knew strong fundamental operations procedure.' Rick Harder, who was the General Manager for Network Operations for Alabama, consulted Cloar about the Montgomery district. Cloar suggested Wyatt as the person who could handle managing the district. At some time, Jerry Sanders was the vice-president for Network Operation South. He also asked that Wyatt be sent to Montgomery.
"Harder discussed the Montgomery situation with Wyatt. At the time of the discussions, Wyatt had a secure job with the company in Birmingham and enjoyed an excellent reputation. During the discussions with Wyatt about a possible move to Montgomery, Harder made it clear that the Montgomery office had serious problems and that Wyatt, if he accepted the job, was expected to solve those problems and make the office productive. Harder and Wyatt both understood that there was a potential for backlash from the employees of the Montgomery office and that there might be repercussions against Wyatt in terms of employee dissatisfaction and unrest. Eventually, as a result of the company's urging, Wyatt agreed to go to Montgomery as the senior manager, a job formally titled Operations Manager. Harder promised Wyatt his support. Specifically, Harder told him that the company would conduct a full and fair investigation of any complaints of employees about him, would hear both sides of any controversy concerning his management of the district, and would view any complaints about his management `skeptically.'
"In May 1991, Wyatt began his job as Operations Manager in Montgomery. His management evaluation for 1991 indicated that his supervisors were pleased with his performance. In January 1994, Don Pickens assumed the post of General Manager of Network Operations, the position formerly held by Rick Harder. Pickens thus became Wyatt's direct supervisor. Not long after assuming the position, Pickens went to Montgomery for a meeting and had the occasion to meet with many of Wyatt's staff and management people. Pickens made a point of telling the managers under Wyatt that his door was open and that he was available. On February 1, one of the Montgomery managers who worked for Wyatt, Hank Thornton, called and asked to meet with Pickens. A meeting was set up for the next day in Birmingham. At the meeting, Thornton *405 discussed his problems with Wyatt's management style. Pickens asked Thornton if the other managers felt the way he did and Thornton told Pickens that they would have to speak for themselves. Although the facts differ somewhat between the witnesses as to how the other managers got involved, suffice it to say that all of the other managers except for Travis Barley contacted Pickens almost immediately and complained about Wyatt. Barley was considered to be loyal to Wyatt. After talking with the Montgomery managers, Pickens decided to send Bill Lee and Don Burchfield to Montgomery to interview the managers who had complaints about Wyatt. Lee was the Director of Human Resources and Burchfield worked with him. Ernest Huddleston, the Security Manager in Mobile, was asked to attend by the Executive Director for Security, Mickey Cox.
"On February 3, Lee, Burchfield and Huddleston all traveled to a motel in Prattville, Alabama near Montgomery to meet with the managers. At the managers' request, the meeting took place in a group setting. Wyatt was out of town at the time. The meeting began with Lee discussing the prior incidents involving Wyatt. Following Lee's introduction, the manager then aired their grievances about Wyatt concentrating on what they believed was an intimidating and profane management style. During the meeting, several employees admitted that they had not told the truth during previous investigations of Wyatt's conduct. Following the meeting, Lee and Burchfield returned to Birmingham and told Pickens about the meeting. Based on this discussion, a recommendation to terminate Wyatt was issued. The recommendation was passed up the supervisory line and Wyatt's termination was authorized. Wyatt was not interviewed before the decision was made to terminate him and no review was made of his personnel file. He was not given an opportunity to rebut the charges against him.
"On February 4, Pickens and Lee traveled to Montgomery to meet with Wyatt and inform him that he had been terminated. Becky Dunn, the vice-president for Human Resources, asked the Director of Security, Mickey Cox, to accompany Pickens and Lee to Wyatt's office to act as a witness and to recover any keys, identification cards and proprietary materials that Wyatt may have had. Pickens, Lee and Cox met with Wyatt in his office. Pickens informed Wyatt that he was being terminated because serious allegations had been made against him. He refused to divulge to Wyatt the details of the allegations or the names of the persons who had made them. At Cox's request, Wyatt handed over his keys. Cox stayed with Wyatt while he boxed up his personal belongings. After Wyatt was terminated, a decision was made to develop a record of statements from the persons who had participated in the February 3 meeting. The interviews for those statements were taken late in February, 1994."
II.
Question No. 1
"Under Alabama law, may a terminated at-will employee who prevails on a promissory estoppel claim which does not alter his at-will status recover lost wages and benefits for the period after the termination of his employment?"
We have accepted, without independent analysis, the district court's conclusion, evident from the phrasing of the issue, that the conduct of BSC described in the fore-going factual background does not in any way alter the fundamental nature of Wyatt's at-will employment status.[1] *406 Moreover, we have also accepted without further analysis the district court's conclusion that the elements of promissory estoppel can be proven based on the statement of facts. Consequently, to answer this question, we assume 1) that the plaintiff Wyatt will prevail on his allegation that BSC promised it would investigate any complaints against him, would listen to both sides of the story, and would view with skepticism any criticism of his performance; 2) that BSC is precluded by the doctrine of promissory estoppel from denying such promises were made; and 3) that, even with the first two assumptions, Wyatt will not be able to show that his subsequent discharge was wrongful, because of the rule that an employee's contract for at-will employment may be terminated by either party with or without cause or justification. Hoffman-La Roche, Inc., v. Campbell, 512 So.2d 725, 728 (Ala.1987).
In this posture, Wyatt's position is analogous to that of a plaintiff who claims the defendant denied him a due-process hearing, but who would not have prevailed even had he been allowed a hearing. See Hessel v. O'Hearn, 977 F.2d 299, 302 (7th Cir.1992) (in an action under 42 U.S.C. § 1983, if the plaintiff's right to a hearing has been denied, but at a hearing the plaintiff would not have won, then the plaintiff must prove some emotional harm or other specific injury in order to recover more than nominal damages).
We will consider the extent to which lost wages can form a component of damages under the facts stated by the district court, assuming the plaintiff prevails on his promissory-estoppel theory. While Alabama has accepted the doctrine of promissory estoppel, as it is stated in Restatement (First) of Contracts § 90 (1932), see Dixieland Food Stores, Inc. v. Geddert, 505 So.2d 371 (Ala.1987), this Court has not had occasion to determine the scope of the damages recoverable under this doctrine. We are impressed with the analysis in Remes v. Nordic Group, Inc., 169 Vt. 37, 40-41, 726 A.2d 77, 79-80 (1999), where the Supreme Court of Vermont stated:
"Vermont courts have in the past allowed compensatory or reliance damages in promissory estoppel cases. See Foote [v. Simmonds Precision Products Co.], 158 Vt. 566, 613 A.2d 1277 [(1992)]; Stacy v. Merchants Bank, 144 Vt. 515, 521-22, 482 A.2d 61, 64-65 (1984). We have never suggested, however, that promissory estoppel damages are coextensive with full contractual remedies. See 3 E. Holmes, Corbin on Contracts § 8.11 (1996) (promissory estoppel remedy is not necessarily co-extensive with damages for breach of contract). The nature of damages afforded must correlate to the nature of the action brought.
"Promissory estoppel, as the term itself suggests, does not derive exclusively from legal origins; it has equitable as well as legal aspects.
"`[T]he protean doctrine of "promissory estoppel" eludes classification as either entirely legal or entirely equitable, and the historical evidence is equivocal. It is clear, however, that both law and equity exert gravitational pulls on the doctrine, and its application in any particular case depends on the context in which it appears.'

"Merex A.G. v. Fairchild Weston Sys., Inc., 29 F.3d 821, 825 (2d Cir.1994) (comparing promissory estoppel under Restatement (Second) of Contracts §§ 90, 139 (1981)). The mixed nature of promissory estoppel has led courts to treat the corresponding damages flexibly. See, e.g., id. at 826 (court retains discretion to award relief to avoid injustice); 3 Holmes, supra, §§ 8.8, 8.11 (doctrine of promissory estoppel may justify either equitable remedy or judgment for damages; promissory estoppel remedy *407 is equitably molded ad hoc for each case according to dictates of good faith, conscience and justice). A remedial order in a promissory estoppel case must be fashioned carefully to achieve fairness to all parties according to the circumstances of a particular case. See Kiely v. St. Germain, 670 P.2d 764, 767 (Colo. 1983). While a full range of legal damages may be available, promissory estoppel plaintiffs are not necessarily entitled to them as of right. See id. (interests of justice sometimes best served by partial, rather than total, enforcement of promise); Restatement (Second) of Contracts § 90 cmt. d (full-scale enforcement by normal contractual remedies often appropriate for promise binding under this section, but relief may be limited).
"An award of prejudgment interest in a wrongful termination case serves to compensate plaintiff for the lost use of money that plaintiff otherwise would have earned. See Chandler v. Bombardier Capital, Inc., 44 F.3d 80, 83 (2d Cir.1994). Since prejudgment interest constitutes a part of the normal remedy in such cases, see Restatement (Second) of Contracts § 354(1) cmt. c, illus. 7 (1981) (providing for prejudgment interest for damages in wrongful discharge suit), it is likewise available, under the court's discretion, in molding the relief that justice requires in a promissory estoppel case. Merex, 29 F.3d at 826. We now adopt this approach and hold that promissory estoppel damages should be discretely designed as corrective relief to rectify the wrong committed in a particular case. See Holmes, supra, § 8.8. We conclude that in this case it was within the trial court's discretion to award prejudgment interest. Our conclusion obviates the need to address whether prejudgment interest should have been awarded here as a matter of right. We nevertheless note that in a promissory estoppel case the question of interest may be more properly committed to the sound discretion of the trial court than awarded as of right given the mixed legal and equitable nature of the claim."
If BSC had performed in accordance with the promises made to Wyatt, then BSC would have made a full investigation; it would have heard both sides of the story; and it would have looked at the allegations against Wyatt with skepticism. However, BSC could have terminated Wyatt at the end of its investigation, for any reason whatever. Under these circumstances, we exercise our discretion by restricting Wyatt's recoverable damages to compensation for those losses that directly derive from the breach of BSC's promises, not to include losses that stem from the termination of his employment. In Curacare Inc. v. Pollack, 501 So.2d 470 (Ala. Civ.App.1986), the employment relationship between the parties was governed by a written contract that expressly stated that termination of the relationship by either party was to be accompanied by two weeks' written notice. The employee was terminated before the end of the contract term, without written notice. He sued. Id. at 471. A jury returned a verdict in favor of the employee, awarding him $8,500 in damages, which was well in excess of the $562.50 in salary he would have earned during the two weeks for which he was entitled to notice. The employer appealed. Id. The Court of Civil Appeals held that the remedy for the employer's breach of the contract was to put the employee in the position he would have occupied absent the breach. Id. at 472. The court held:
"[I]f Curacare had performed in accordance with the terms of the contract, it would have provided Pollack with written notice of termination, rather than oral notice. Written notice of termination would have provided Pollack two weeks' notification before his eventual termination. Written notice would have constituted perfect performance under the terms of the contract between the parties. Thus, any [damages] award to *408 Pollack in excess of two weeks' compensation, $562.50, is excessive."
Id. at 472.
Just as the plaintiff in Curacare was entitled to lost wages and benefits only for the two-week notice period, Wyatt is entitled to receive only the lost wages and benefits he would have received for the time it would reasonably have taken BSC to conduct the investigation it should have conducted.
III.
Question No. 2
"Under Alabama law, may a terminated at-will employee who prevails on a promissory estoppel claim which does not alter his at-will status recover damages for mental anguish arising from the termination of his employment?"
The doctrine of promissory estoppel should not be used as a basis for awarding damages that would not, under general principles of contract law, be recoverable in an action for breach of contract. Otherwise, the plaintiff in an action founded on promissory estoppel would be in a better position than if he had been entitled to recover in an action on a contract. See Deli v. University of Minnesota, 578 N.W.2d 779, 783 (Minn.Ct.App. 1998) ("Because promissory estoppel is a contract-based claim, to recover emotional distress damages, Deli was required to plead and prove the existence of an independent tort."). Our law also requires that the plaintiff prove an independent tort in order to recover damages for mental anguish in an employment setting. In Hobson v. American Cast Iron Pipe Co., 690 So.2d 341 (Ala.1997), we stated: "This Court has not recognized claims for emotional distress in an employment case. In fact, it has stated: `[N]o recovery has ever been allowed for mental distress arising from the wrongful discharge of an employee in breach of an employment contract.'" Id. at 344, citing Southern Medical Health Systems, Inc., v. Vaughn, 669 So.2d 98 (Ala.1995). Surely, as an employee at will, Wyatt cannot recover compensatory damages for mental anguish when employees whose employment was not at will could not have recovered
CERTIFIED QUESTIONS ANSWERED.
HOOPER, C.J., and MADDOX, COOK, SEE, BROWN, and ENGLAND, JJ., concur.
HOUSTON and JOHNSTONE, JJ., concur in part and dissent in part.
HOUSTON, Justice (concurring as to the answer to the second question and dissenting as to the answer to the first question).
The answer to the first question is limited by the designation of Wyatt as "a terminated at-will employee," because this precludes a consideration of the promissory-estoppel claim as altering his "at-will" status. Even so, if Wyatt proves to a jury's reasonable satisfaction that if Bell-South had honored its promises, then, more likely than not, it would not have discharged him and he would have remained in BellSouth's employ, I would permit Wyatt to offer evidence of lost wages as an element of his recoverable loss sustained as a result of BellSouth's alleged perfidy, and, if a jury agrees with him, to collect those wages as damages.
Thus, I dissent from the answer given to the district court's first question. However, I concur in the answer given to the second question.
JOHNSTONE, J., concurs.
NOTES
[1] Justice Houston's dissent directed to our answer to the first question would strike through that portion of the question containing the premise that Wyatt's at-will status would not be altered even if he prevailed on the promissory-estoppel claim. We have answered the question as it is phrased and express no opinion as to the validity of its premise.