872 So.2d 833 (2003)
WAL-MART STORES, INC., et al.
v.
Ross SMITHERMAN.
1000684.
Supreme Court of Alabama.
May 2, 2003.
Rehearing Denied August 29, 2003.
*835 Michael M. Shipper and Kirkland E. Reid of Miller, Hamilton, Snider & Odom, L.L.C., Mobile, for appellants.
Tracy T. Sproule, Leah O. Taylor, and Rhonda Pitts Chambers of Taylor & Taylor, Birmingham, for appellee.
PER CURIAM.
The defendants Wal-Mart Stores, Inc. ("Wal-Mart"), and its employees Joe Paxton and Sheila Easterling appeal from a judgment entered on a jury verdict, awarding $100,000 to Ross Smitherman on his claims alleging negligence, wantonness, slander, and the tort of outrage. We reverse and remand.

I. Facts
This action arises out of a dispute between Smitherman, an employee of Merita Baking Company ("Merita"), and Wal-Mart over whether Smitherman should, at the instance of Wal-Mart, have credited Wal-Mart approximately $1.00 for an empty bread bag found during a routine bread delivery from Merita to the Wal-Mart Supercenter store in Prattville ("the Supercenter"). On the day the dispute arose, the assistant manager of the Supercenter admitted Smitherman through the back *836 door into the vendor receiving area of the Supercenter. After Smitherman collected stale and damaged bread from the Supercenter shelves, he wrote Wal-Mart a credit slip for the stale and damaged bread. Smitherman then unloaded three rolling racks with trays of fresh bread from his delivery truck. As he rolled the racks filled with fresh bread through the back door of the Supercenter, the assistant manager checked in the delivery by scanning and counting the packages of bread. Smitherman then wrote an invoice for the charge to Wal-Mart and placed the bread on the shelves inside the store.
While Smitherman was placing the bread on the shelves, Easterling, a Wal-Mart employee, took the assistant manager's place as the receiving clerk. When Smitherman rolled his empty racks with empty trays to the back door in the receiving area, Easterling looked at the trays to make sure that Smitherman was not attempting to leave the store with any merchandise that had not been credited to Wal-Mart. She noticed an empty, flat bag in one of the trays. The empty bag would have held Sunmaid Raisin Bread, which, if charged to Wal-Mart, would cost a little more than a dollar.
Easterling assumed that Wal-Mart had, on a prior delivery, been charged for a loaf of bread that she assumed the bag had contained, and asked Smitherman to credit Wal-Mart for the price of the loaf of bread. Smitherman contended that the empty bread bag had never been filled with bread, but, rather, had been ejected by the packaging machine and then buried among successfully bagged loaves of bread. The accounts of Smitherman and Easterling of their conversation regarding the credit differ markedly. However, it is undisputed that Smitherman left the Supercenter without giving Wal-Mart a credit for the loaf of bread.
Later that same day, Smitherman's supervisor, James Maddox, telephoned Smitherman at home and told him that Joe Paxton, one of the managers of the Supercenter, had said that Wal-Mart did not want Smitherman to make any more deliveries to the store because of the incident. The next day, Maddox and Merita's district sales manager, Tommy McDaniel, visited Paxton at the Supercenter and told him Smitherman had refused to credit Wal-Mart because the empty bag had never been filled with bread. They also told Paxton that Smitherman would lose his job if he could not continue to deliver to Wal-Mart stores. Paxton told them that he would talk with the manager of the Supercenter, but that, in the meantime, Smitherman could not make deliveries to any Wal-Mart stores.
Maddox made Smitherman's scheduled stop at the Supercenter the next day. When he arrived, Paxton told him Smitherman was banned from delivering to the Supercenter. As a result of the dispute, Merita assigned Smitherman a route that did not necessitate contact with any Wal-Mart store. The new route was less lucrative and less convenient for Smitherman.
On March 17, 1999, Smitherman sued Wal-Mart, Easterling, and Paxton. As eventually amended, the complaint contained six counts. Count one alleged that the defendants had interfered with a business relationship between Smitherman and Merita. Count two alleged slander. Counts three and four alleged wrongful or intentional infliction of emotional distress (the tort of outrage). Count five alleged negligent or wanton training and supervision. Count six alleged, in toto:
"1. [Smitherman] realleges all allegations contained in this Complaint.
"2. [Smitherman] claims damages against Defendant Wal-Mart and Defendant Paxton for their negligence and/or *837 wantonness in failing to investigate and/or follow the necessary policies and procedures to evaluate the incident at issue.
"3. [Smitherman] avers that Defendant Wal-Mart and Defendant Paxton were negligent and/or wanton in that they failed to adequately investigate and/or follow the necessary policies and procedures to evaluate the incident at issue.
"4. The negligence and/or wantonness of Defendant Wal-Mart and Defendant Paxton in failing to investigate and/or follow the necessary policies and procedures to evaluate the incident at issue was a proximate cause of [Smitherman's] damages.
"WHEREFORE, [Smitherman] demands judgment against Defendants Wal-Mart and Paxton for the damages, both compensatory and punitive, plus interest [and] all costs of this proceeding in an amount exceeding the jurisdictional minimum of this court."
Before trial, Smitherman dismissed his slander claim against defendant Easterling. Wal-Mart, Easterling, and Paxton, all represented by the same attorney, jointly moved for a summary judgment on all remaining claims. The trial court entered a summary judgment in favor of the defendants on Smitherman's tortious-interference claim. The case proceeded to trial on the theories of (1) negligent and/or wanton supervision and investigation, (2) slander as to Wal-Mart and Paxton, and (3) the tort of outrage.
At the close of the plaintiff's case-in-chief and again at the close of all the evidence, the defendants moved for a judgment as a matter of law ("JML") on all claims tried. The trial court denied the motions. The jury returned a general verdict in favor of Smitherman and against all the defendants for $100,000. The defendants filed a renewed motion for a JML or, in the alternative, for a new trial. The trial court denied the motion. The defendants appeal, arguing that they were entitled to a JML as to all the claims.

II. Applicable Standard of Review
"We apply the same standard of review to a ruling on a motion for a JML as the trial court used in initially deciding the motion. This standard is `indistinguishable from the standard by which we review a summary judgment.'" Alabama Power Co. v. Aldridge, 854 So.2d 554, 560 (Ala.2002) (quoting Hathcock v. Wood, 815 So.2d 502, 506 (Ala.2001)). "We must decide whether there was substantial evidence, when viewed in the light most favorable to the plaintiff, to warrant a jury determination." Id. (citing City of Birmingham v. Sutherland, 834 So.2d 755 (Ala.2002)). "[S]ubstantial evidence is evidence of such weight and quality that fair minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989).
"The existence of a duty is a question of law to be determined by the ... court." Ex parte Farmers Exchange Bank, 783 So.2d 24, 27 (Ala.2000). See also State Farm Fire & Cas. Co. v. Owen, 729 So.2d 834 (Ala.1999).

III. The Claims

A. Negligent and/or Wanton Training and Supervision and Failure to Investigate
Wal-Mart, Easterling, and Paxton argue that Smitherman did not present substantial evidence to prove his negligence and wantonness claims. In that connection, they state:
"Smitherman has never been employed in any capacity by Wal-Mart. He has no contract with Wal-Mart. He was *838 never promised that he could continue to deliver bread to Wal-Mart indefinitely. Wal-Mart became dissatisfied with Smitherman because Smitherman refused to provide a $1 credit to Wal-Mart's account for a bread bag he was removing from the premises. Wal-Mart asked Merita Bread to send a different delivery man to its store from that point forward."
Appellants' Brief, at 15. Thus, Wal-Mart, Easterling, and Paxton insist, they cannot be liable for the manner in which they investigated the merits of the dispute whether Wal-Mart was entitled to a credit for the empty bread bagbecause, they argue, they did not owe any duty to Smitherman, as an employee and sales representative of Merita, its bread vendor, to continue to allow Smitherman to deliver to Wal-Mart.
We agree with this argument, because it illustrates the fatal flaw in Smitherman's negligent and/or wanton failure-to-investigate claim. The flaw is that Smitherman has failed to cite, argue, or allege a principle of law that would prohibit Wal-Mart from refusing to deal with him for any reasonor for no reason. In the absence of such a principle, there could be no legal injury flowing from Wal-Mart's allegedly deficient investigation.
In essence, this claim is a wrongful discharge claim, masquerading as a negligent and/or wanton failure-to-investigate claim, where no wrongful-discharge claim has been, or could have been, maintained. In particular, count six of Smitherman's complaint alleges only that Wal-Mart and Paxton negligently or wantonly failed to investigate the credit dispute. Thus, Smitherman did not allege in his complaintand does not argue on appeal that his claim is one for wrongful termination of employment. Neither does he allege or argue that Wal-Mart owed him a right of permanent access to its premises for service of its Merita account, and the facts of this case would not support such a claim.
This is so, because Smitherman does not purport to be a Wal-Mart employee. Indeed, it is undisputed that he works for Merita, and, indeed, he claims to have no contractual or business relationship with Wal-Mart.[1] "Under Alabama law, an employment contract is generally terminable at will by either party, with or without cause or justificationfor a good reason, a wrong reason, or no reason at all." Culbreth v. Woodham Plumbing Co., 599 So.2d 1120, 1121 (Ala.1992); see also Turner v. Shorty's Truck & R.R. Car Parts, Inc., 723 So.2d 1279, 1282 (Ala.Civ. App.1998) (the employment of an at-will employee may be terminated at any time, "for a good reason, for a bad reason, or for no reason").
"In Alabama, `permanent' employment is `so long as [the employer is] engaged in the same nature of business and need[s] the services of [the] employee, and [the employee is] able and willing to do it satisfactorily and [gives] no cause for his discharge.'" Matthews v. Alabama Agric. & Mech. Univ., 716 So.2d 1272, 1277 (Ala.Civ.App.1998) (emphasis added) (quoting Alabama Mills v. Smith, 237 Ala. 296, 299, 186 So. 699, 701 (1939)). Because he does not claim to be an employee of Wal-Mart, a fortiori, he has no claim to permanent-employee status, so as to restrict the manner in which Wal-Mart may deal with him.
In short, neither Smitherman, nor Justice Johnstone in his special writing, can *839 answer Wal-Mart's argument that it had an unqualified right to deny him access to its premises to service its account with Merita. Justice Johnstone's special writing alludes to the testimony of a certain Wal-Mart official, who suggested that Wal-Mart had a "policy [to] hear both sides of a situation." 872 So.2d at 843 (testimony of Paxton) (emphasis omitted). On the basis of such testimony, Justice Johnstone proposes that Wal-Mart voluntarily assumed a duty to conduct a good faith investigation of the incident. From this proposition, Justice Johnstone leaps to the conclusion that Wal-Mart had a duty not to ban Smitherman if he was not in the wrong. His special writing simply ignores the dispositive issue, namely, the source, if any, of the restriction it seeks to impose on Wal-Mart's unqualified legal right to refuse to deal with Smitherman.
The implications of Justice Johnstone's special writing are most troubling. Under the rule he would adopt, an employer could transform its relationship with an employee from at-will to permanent, simply by admitting that it aimed to treat its employees fairly as a matter of policy. Such a principle is not, and should not be, the law in Alabama. For these reasons, the trial court erred in submitting the negligence and wantonness claims to the jury.

B. Slander
Counts two and three allege that Wal-Mart and Paxton falsely accused Smitherman "of stealing a loaf of bread." Wal-Mart argues that it is not liable for slander, because, it says, the statement made by Paxton that Smitherman tried to leave the store with an empty bread bag without crediting Wal-Mart for the bread is a true statement.
Easterling, the receiving clerk, testified that she told the head invoicing clerk, Lorie Lopez, that Smitherman had tried to leave the store with an empty bread bag without crediting Wal-Mart for the price of the loaf of bread. Lopez then told one of the managers of its food department, Joe Paxton, the same. Paxton told his superior, store manager Vanessa Withrow, that, while Easterling was working as a receiving clerk, Smitherman had tried to leave the store with an empty bread bag without crediting Wal-Mart for the price of the loaf of bread. Following Withrow's instruction, Paxton telephoned Wal-Mart's district manager and Wal-Mart's district loss-prevention manager, and discussed the incident with them. Paxton told them that Smitherman had tried to leave the store with an empty bread bag without giving Wal-Mart credit. Paxton, Withrow, the district manager, and the loss-prevention manager then decided to ban Smitherman as a deliveryman. Paxton then told Maddox, Smitherman's supervisor at Merita, that Smitherman was banned from delivering to any Wal-Mart store because he had tried to leave the Supercenter with an empty bread bag without crediting Wal-Mart for the price of the loaf of bread.
Maddox, Smitherman, and Merita's district sales manager McDaniel each testified that a vendor's charging a customer for merchandise, but leaving the store with the merchandise and without crediting the customer for the merchandise, constitutes vendor theft. They testified that Wal-Mart and Paxton had accused Smitherman of theft. While neither Maddox nor McDaniel believed that Smitherman had stolen a loaf of bread, they placed Smitherman on another delivery route, requiring him to work longer hours for less money. Smitherman admitted that, as he was leaving the Supercenter, Easterling found an empty bread bag in one of his trays and asked him to give Wal-Mart credit for the bread. Further, Smitherman admitted that he had not given Wal-Mart the credit before he left the store.

*840 "The elements of a cause of action for defamation are: 1) a false and defamatory statement concerning the plaintiff; 2) an unprivileged communication of that statement to a third party; 3) fault amounting at least to negligence on the part of the defendant; and 4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication of the statement."
McCaig v. Talladega Publ'g Co., 544 So.2d 875, 877 (Ala.1989). "Truth is an absolute defense to defamation...." Foley v. State Farm Fire & Cas. Ins. Co., 491 So.2d 934, 937 (Ala.1986). Dispositive of the slander claim is the issue of truth as an absolute defense.
The only allegedly defamatory statements the evidence proves that any Wal-Mart employee uttered were to the effect that Smitherman had tried to take an empty bread bag out of Wal-Mart without crediting Wal-Mart with the price of the loaf of bread. Although Maddox and McDaniel might have construed those statements as accusing Smitherman of committing a crime of theft, the statements were true and therefore not actionable. Foley, supra. Therefore, Wal-Mart and Paxton were entitled to a JML on the slander claims.

C. Tort of Outrage
Counts three and four allege that the defendants intentionally inflicted emotional distress on Smitherman by committing outrageous conduct against him.
"[O]ne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress and for bodily harm resulting from the distress. The emotional distress thereunder must be so severe that no reasonable person could be expected to endure it. Any recovery must be reasonable and justified under the circumstances, liability ensuing only when the conduct is extreme.... By extreme we refer to conduct so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society...."

American Road Serv. Co. v. Inmon, 394 So.2d 361, 365 (Ala.1980) (emphasis added).
The conduct of Wal-Mart, Paxton, and Easterling does not meet the Inmon definition of outrageous conduct. Indeed, the tort-of-outrage claim is predicated solely on their exercise of what we described in Part III.A. of this opinion as an unqualified right. In Harrell v. Reynolds Metals Co., 495 So.2d 1381 (Ala.1986), for example, this Court said:
"[I]t would be intolerable in a civilized society to hold that an employer is guilty of outrageous conduct for merely discharging an employee at will. That is what the plaintiff is asking this Court to do, for the termination is not for a reason which contravenes public policy, and there is no evidence that the termination was accompanied with the sound of fury."

Id. at 1387 (emphasis added). The same is true in this case, to the extent that Smitherman's relationship with Wal-Mart was analogous to employment. There is no evidence or contention that Smitherman's change in status with Wal-Mart was accompanied by anything approximating "the sound of fury." The trial court erred, therefore, in submitting the tort-of-outrage claim to the jury.

IV. Conclusion
For the reasons discussed above, Wal-Mart, Paxton, and Easterling were entitled to a JML on all Smitherman's claims. *841 Consequently, the judgment of the trial court is reversed and the cause is remanded for proceedings consistent with this opinion.
REVERSED AND REMANDED.
HOUSTON, SEE, BROWN, HARWOOD, WOODALL, and STUART, JJ., concur.
LYONS, J., concurs in part and concurs in the result.
MOORE, C.J., and JOHNSTONE, J., concur in part and dissent in part.
LYONS, Justice (concurring in part and concurring in the result).
I accept the premise that Wal-Mart, Paxton, and Easterling voluntarily assumed a duty to Smitherman to conduct a fair and reasonable investigation. I cannot treat that duty as binding Wal-Mart, Paxton, and Easterling to a course of action if the result of such investigation would have exonerated Smitherman.
Smitherman's claim is predicated on a right to insist that Wal-Mart, Paxton, and Easterling, after a thorough investigation, had the additional duty to abide by the results of that investigation if they were favorable to him. In Wyatt v. BellSouth, Inc., 757 So.2d 403, 407 (Ala.2000), this Court held that where an employer has the right to discharge an employee for any reason, a promise to conduct a due-process hearing before any discharge does not prevent the employer from discharging the employee without cause at the conclusion of the hearing. Although Smitherman did not have an employer/employee relationship with Wal-Mart, I cannot distinguish Wyatt on that ground because I do not see how Wal-Mart should owe a duty to the employee of a contractor that it would not owe to one of its own employees.
I concur fully in the majority opinion's disposition of the claims of slander and the tort of outrage.
MOORE, Chief Justice (concurring in part and dissenting in part).
I concur in the Court's reversal of the judgment for Ross Smitherman and its holding that Wal-Mart, Paxton, and Easterling are entitled to a judgment as a matter of law on Smitherman's negligence and wantonness claims and on his tort-of-outrage claim. However, I dissent from the judgment as a matter of law for Wal-Mart and Paxton as to Smitherman's slander claim.
The Court concludes that the statements made by Wal-Mart employees to Smitherman's superiors at Merita did not constitute slander because they were true statements, and "[t]ruth is an absolute defense to defamation." Foley v. State Farm Fire & Cas. Ins. Co., 491 So.2d 934, 937 (Ala. 1986). The "true" statements at issue were that Smitherman left the store with an empty bread bag without crediting Wal-Mart with the price of the loaf of bread.
However, both Smitherman's supervisor and Merita's district sales manager testified that those statements amounted to accusations of "vendor theft." "Vendor theft" occurs when a vendor charges a customer for merchandise and then leaves the store with the merchandise without crediting the customer for the merchandise. In this case, the vendor was Merita; the customer was Wal-Mart. By stating that Merita's employee Smitherman attempted to leave the store with an empty bag of bread without crediting Wal-Mart for the bread, Wal-Mart personnel accused Smitherman of stealing from Wal-Mart.
That the statements in question amounted to a theft accusation is obvious from what happened after Wal-Mart employees related the incident to their supervisors, who then related the incident to Smitherman's superiors. Wal-Mart banned *842 Smitherman from delivering to any of its stores, and Merita reassigned Smitherman to a less lucrative delivery route as a result of the accusatory statements. Ultimately, the facts demonstrated that Smitherman did not steal from Wal-Mart, but rather that the bread bag had always been empty and that it had never been charged to Wal-Mart's account. Thus, while Smitherman did attempt to leave Wal-Mart without giving the store credit for the bread, the store was never entitled to a credit; therefore, Smitherman committed no wrong.
Despite this, the Court explains its finding that the statements do not amount to slander by observing that the statements may have been "construed ... as accusing Smitherman of committing a crime of theft, [but] the statements were true and therefore not actionable." 872 So.2d at 840. However, the statements by the Wal-Mart employees are akin to a store owner's telling a policeman that someone left the store with a package without paying for it. The obvious meaning is that the person stole the package. Until the parties learn that the customer owned the package before he entered the store, the consequences for the accused party can be dire. In reality, the statement is half true rather than true, because the accuser has not provided the full context for the statement.
At times, a half-truth can be the equivalent of an untruth, particularly when spread in the form of an accusation, which was the case here. Wal-Mart's accusations, while not using the word "theft," amounted to false allegations of theft by Smitherman. Adverse consequences for Smitherman resulted from the false accusations, the very definition of slander. See McCaig v. Talladega Publ'g Co., 544 So.2d 875, 877 (Ala.1989). To find that the statements were true and to excuse Wal-Mart and Paxton on the basis of semantics involves an intentional evasion of the obvious import of those statements for everyone who heard them. The statements constituted slander; therefore, I must dissent from the reversal of the judgment on this claim.
JOHNSTONE, Justice (concurring in part and dissenting in part).
The main opinion takes the insupportable position that Wal-Mart could not voluntarily undertake a duty it did not otherwise owe and could not voluntarily relinquish a prerogative it otherwise had. Legally it could, and factually it did, as this writing will demonstrate.
I respectfully dissent from the rationale and holding to the effect that the trial court erred in denying the defendants' motions for a judgment as a matter of law as they apply to the plaintiff's claims for negligence and wantonness against Wal-Mart and its "food co-manager" Joe Paxton. Substantial evidence supports the inference that Wal-Mart voluntarily undertook a duty it otherwise would not have owed and, through Paxton and other employees, negligently and even wantonly breached that duty by banning the plaintiff from delivering bread to Wal-Mart.
The plaintiff, in Count Six as last amended, alleged that he was damaged as a proximate result of the negligence or wantonness of Wal-Mart and Paxton "in failing to investigate and/or follow the necessary policies and procedures to evaluate the incident at issue." (Emphasis added.) As actually tried to the jury, the plaintiff's theory was that Wal-Mart voluntarily undertook a policy and procedure, as a duty owed to the plaintiff, to investigate the incident and to heed the results of the investigation.
The plaintiff has never claimed that he was an employee of Wal-Mart or that Wal-Mart was his employer. The plaintiff *843 has never claimed that Wal-Mart owed him any duty based on any employment relationship. Therefore, the discussion in the main opinion about employment law and the employment-at-will doctrine is inapposite. If that discussion is intended as an analogy, even the analogy fails because the employer can voluntarily relinquish its employment-at-will prerogative to discharge the employee without cause, see Hoffman-La Roche v. Campbell, 512 So.2d 725 (Ala.1987), much as any party can voluntarily undertake a duty the party would not otherwise owe, Spriggs v. Compass Bank, 742 So.2d 178, 181 (Ala.Civ. App.1997), Beasley v. MacDonald Engineering Co., 287 Ala. 189, 194, 249 So.2d 844, 848 (1971), and Rudolph v. First Southern Federal Savings & Loan Association, 414 So.2d 64, 71 (Ala.1982). Of course, just as the issues of employment at will are not before us, the issues and requisites of Hoffman-La Roche are not before us.
In the case before us, the plaintiff introduced the testimony of managerial employees of Wal-Mart itself to prove the duty to the plaintiff voluntarily undertaken by Wal-Mart. Paxton himself testified:
"Q. Did you feel that it was your duty as the manager to go through certain steps and research the situation and contact the vendor before terminating the vendor from coming into Wal-Mart?
"A. Certainly. It is our policy or our belief that you should hear both sides of a situation, not automatically assume that the Wal-Mart associate is correct. But you need to listen to both sides of the scenario."
(R. 201-02.) (Emphasis added.) Likewise, Roger Smith, the district loss prevention manager for Wal-Mart, testified:
"Q. As the district loss prevention manager for Wal-Mart, how would you instruct one to investigate this situation?
"A. I would instruct them, first, he needs to get with the receiving clerk and the bread vendor, which he should have been involved with when it occurred. The receiving clerk should have called a member of management. And he would have been involved with it at that point. If he had been involved with it at that point, he would know most of the facts and he would just need to further question the bread vendor and contact their supervisor.
"Q. Would he need to talk to the delivery person at some point? Let's say he didn't come down. Would he need to talk to that person?
"A. That would be the bread vendor, yes, ma'am.
"Q. When you say bread vendor, you're not talking about the company, you're talking about the delivery
"A. Person, yes, ma'am.

"Q. Then you also said they need to contact the supervisor?
"A. His supervisor, the bread vendor's supervisor, and anybody else that may have been in the area that may have heard the conversations.
"Q. Would you say that he had a duty to do these investigations, these steps of investigation that you just talked about?

"A. Absolutely.

"Q. Would you say that he had an obligation or a duty to the bread vendor to do this type of investigation?

*844 "A. Yes."

(R. 313-14.) (Emphasis added.)
Smith identified Paxton specifically as one Wal-Mart employee responsible for performing this duty to the plaintiff. (R. 313.) The evidence of record is abundant that Wal-Mart and Paxton, knowing that banning the plaintiff from delivering bread to Wal-Mart would damage him, conducted no responsible investigation and banned the plaintiff for refusing to credit Wal-Mart for bread that had never been put into the empty bread bag and had never been charged to Wal-Mart in the first place.
The main opinion ridicules the conclusion that a duty to investigate entails a concomitant duty to heed the results of the investigation. This ridicule is like the logic of people who call radio talk shows to declaim that a defendant should be "given a fair trial and a good hanging" regardless of the verdict.
The plaintiff now before us is supported not only by logic but by express testimony. The testimony of Paxton himself, already quoted, that he owed a duty to "research the situation," and to "hear both sides" "before terminating the vendor from coming into Wal-Mart" supports a reasonable inference by the jury that Wal-Mart intended the relation between the investigation and any termination to be causal rather than merely sequential.
The evidence is sufficient to support the plaintiff's negligence and wantonness theories. This Court should not instruct the trial court to enter judgment as a matter of law against the plaintiff on his claims on these theories.
I express no opinion on the rationale and holding of the main opinion to the effect that the trial court erred in denying the defendants' motions for judgment as a matter of law as they apply to the plaintiff's slander claims. I concur only in the result of the holding to the effect that the trial court erred in denying the defendants' motions for judgment as a matter of law as they apply to the plaintiff's outrage claims. I do not subscribe to the hyperbole about the employment-at-will doctrine quoted by the main opinion from Harrell v. Reynolds Metals Co., 495 So.2d 1381, 1387 (Ala.1986). Because nobody claims any employment relationship in the case before us, this hyperbole merely exacerbates the confusion the main opinion has already caused by arguing employment law and ignoring the law and evidence supporting the plaintiff's claims against Wal-Mart and Paxton for negligence and wantonness in breaching a duty voluntarily undertaken.
NOTES
[1] The parties do not apprise this Court of the precise nature of the business relationship between Wal-Mart and Merita. It is clear, however, that the only contractual relationship evident in this case is the one between Smitherman and Merita.