986 So.2d 387 (2007)
CARRAWAY METHODIST HEALTH SYSTEMS and Carraway Management Foundation, Inc.
v.
William D. WISE.
William D. Wise
v.
Carraway Methodist Health Systems and Carraway Management Foundation, Inc.
1041483 and 1041545.
Supreme Court of Alabama.
November 30, 2007.
*388 Peyton Lacy, Jr., Sandra B. Reiss, and Christopher A. Mixon of Ogletree, Deakins, Nash, Smoak & Stewart, P.C., Birmingham, for appellants/cross-appellees Carraway Methodist Health Systems and Carraway Management Foundation, Inc.
Stephen D. Heninger of Heninger, Burge, Vargo & Davis, LLP, Birmingham, for appellee/cross-appellant William D. Wise.
LYONS, Justice.[1]
Carraway Methodist Health Systems ("CMHS") and Carraway Management *389 Foundation, Inc. ("the Foundation") (hereinafter sometimes referred to jointly as "the Carraway entities"), appeal from a judgment entered on a jury verdict in favor of William D. Wise on his breach-of-contract claim against them. Wise cross-appeals from a judgment as a matter of law ("JML") entered in favor of the Carraway entities on his tort-of-outrage claim against them. As to the Carraway entities' appeal (no. 1041483), we reverse; as to Wise's cross-appeal (no. 1041545), we affirm.

I. Facts and Procedural History

The Carraway entities were established under the Alabama Nonprofit Corporation Act, § 10-3A-1 et seq., Ala.Code 1975 ("the Alabama Nonprofit Act"). The primary facility operated by CMHS was Carraway Methodist Medical Center in Birmingham, but CMHS also operated other medical-care facilities in central and north Alabama. CMHS established the Foundation to employ key management personnel for the medical facilities operated by CMHS. The Foundation was specifically contractually obligated to employ the chief executive officer ("CEO"), chief financial officer ("CFO"), and general counsel for CMHS. In 1985, the Carraway entities entered into a management contract; that contract stated, in pertinent part:
"[E]ach party covenants that it shall not, during the term of this Agreement and any renewals thereof, and for a period of one (1) year thereafter, directly or indirectly impair or initiate any attempt to impair the relationship or expectancy of a continuing relationship which exists or will exist between the other party and the personnel employed by the other party at any time during the term of this Agreement or renewals thereof, or make offers or contracts of employment or offers or contracts for services with such personnel, or with any partnership, corporation or association through which such personnel may render services or employment to the offending party."
CMHS first employed Wise in its print shop in 1971 while he was attending the University of Alabama at Birmingham. After graduating, Wise continued to work at CMHS while attending the Birmingham School of Law. Wise began working in CMHS's legal department in 1975 and was named its general counsel in 1992. In 1994, the Foundation executed a written employment contract with Wise ("the 1994 contract"). The 1994 contract stated, in pertinent part:
"1. Employment and Term. [The Foundation] hereby employs [Wise] as its Vice President-Legal Affairs and General Counsel, and as Vice President-Legal Affairs and General Counsel of CMHS, for the period beginning September 1, 1994, and ending December 31, 1999; provided that on January 2, 1998 and on January 2 of each subsequent year, the Contract term shall be extended automatically for one (1) year unless either party on or before January 1, 1998 or any January 1 of a subsequent year, gives written notice to the other of its or his intention to terminate the Contract."
Roy Crawford, outside counsel retained by the Carraway entities, drafted the contract. Wise had the opportunity to review the contract before it was presented to the Foundation's board of directors for review. Wise made the following changes to the contract: he changed his title from "Vice President-Legal Affairs" to "Vice President-Legal Affairs and General Counsel"; he changed a provision giving him free medical care so as to include his immediate family; and he changed a provision establishing *390 a death benefit of three months' salary to make the death benefit six months' salary.
In 2000, CMHS's board of directors approved contingency employment contracts for Dr. Robert Carraway, CMHS's CEO, and for Wise ("the 2000 contingency contract"). Crawford also drafted these contracts. Wise's contract stated that "CMHS desires to ensure that Wise's services will remain available to CMHS should his employment by [the Foundation], and thus the availability of his services to CMHS, terminate because of the expiration of the [1994] Contract." According to Dr. Carraway, CMHS was undergoing a financial "crunch" in 2000, and he and the members of CMHS's board of directors were concerned that CMHS might be sold to another entity. Dr. Carraway stated that CMHS executed the 2000 contingency contracts to ensure that any purchaser would have to retain him and Wise and thus continue "a link to the Health Systems." Wise's 2000 contingency contract with CMHS stated, in pertinent part:
"1. Employment and Term. Effective immediately upon the termination of Wise's employment by [the Foundation] because of the expiration of the term of the [1994] Contract as provided in Section 1 thereof on or before December 31, 2010, CMHS shall employ Wise as its Vice President-Legal Affairs and General Counsel for the period ('the Employment Term') beginning on the date Wise's employment with [the Foundation] terminates and ending on the fifth anniversary of the commencement of the Employment Term; provided that on the fourth anniversary date of the commencement of the Employment Term and on said anniversary date of each subsequent year, the Employment Term shall be extended automatically for one (1) year unless either party gives written notice to the other of its or his intention to terminate this Contract before the applicable anniversary date."
In 2000 and 2001, CMHS continued to experience financial difficulties. By May 2002, CMHS says it was in "very, very deep financial distress" with debt of $146 million, including $117 million in bonded indebtedness and $25 million in accounts payable to vendors. CMHS was also in violation of the covenants relating to its bonds because it had insufficient cash on hand. Realizing its financial situation, CMHS's board of directors began considering cost-cutting measures. At a September 2001 meeting of CMHS's board of directors at which Wise was present, the board voted to consider terminating the employment contracts held by senior management. At a December 2001 board meeting, the board established an ad hoc committee to review those employment contracts. Wise was aware of the situation and was encouraged to hire an attorney to protect his interests, which he did in early 2002.
On February 22, 2002, CMHS provided the Foundation with written notice pursuant to the management contract between the Carraway entities that it intended to cancel that contract in 60 days. The notice was hand-delivered to Wise. Because the Foundation was solely funded by CMHS, when CMHS canceled the management contract, funds were no longer available for the Foundation to pay the salaries of senior management. The only remaining employees of the Foundation at the time the management contract was terminated, Dr. Carraway and Wise, were transferred to CMHS's payroll. The Carraway entities contend that Wise became an at-will employee of CMHS when it canceled the management contract; Wise contends that the 2000 contingency contract took effect at that time. It is undisputed *391 that CMHS, not the Foundation, paid Wise's salary in May 2002. The record indicates that Wise's annual base salary at that time was $138,384 and his annual compensation package was approximately $177,300.
In May 2002, Coy Cooper, the chairman of CMHS's board of directors, asked Wise to sign a termination-and-release agreement. The termination-and-release agreement stated:
"The undersigned, William D. Wise, in consideration for (i) his at will employment effective May 4, 2002, by Carraway Methodist Health Systems ('CMHS') as its Vice President-Legal Affairs and General Counsel at an annual salary equal to his salary from Carraway Management Foundation, Inc. ('[the Foundation]') as of May 3, 2002, with benefits comparable to those provided CMHS'[s] other administrative personnel, (ii) the assumption by CMHS of the undersigned's accrued vacation and sick time pay to which the undersigned became entitled as an employee of CMHS, and (iii) the payment of CMHS of 50% of said accrued vacation and sick time pay to the undersigned on June 25, 2002:
"1. The undersigned agrees to the termination as of May 3, 2002, of that certain Employment Contract by and between the undersigned, as employee, and [the Foundation], as employer, dated as of September 1, 1994 (the `Employment Contract'), and further agrees that neither the undersigned nor [the Foundation] has any further rights or obligations thereunder.
"2. The undersigned agrees to the termination as of May 3, 2002, of that certain Employment Contract by and between the undersigned, as employee, and CMHS, as employer, dated as of September 1, 2000 (the `Contingent Employment Contract'), and further agrees that neither the undersigned nor CMHS has any further rights or obligations thereunder.
"3. The undersigned hereby releases and forever discharges CMHS and [the Foundation] from any claims, liabilities, obligations or expenses becoming due and payable under, arising out of, or in any way related to, the Employment Contract or the Contingent Employment Contract or the termination of the Employment Contract and the Contingent Employment Contract."
Wise refused to sign the termination-and-release agreement.
Wise testified that he had plans with his family on Memorial Day of 2002 but that, because Cooper asked him to work that weekend, he canceled his plans and worked as requested. Wise said that his salary check was normally delivered to his office by an employee of the Foundation or "some administrative person." On Friday, May 24, Wise did not receive his check as scheduled.[2] On Memorial Day, May 27, Wise spoke to Cooper by telephone and asked Cooper for his check. According to Wise, Cooper told him, referencing the termination-and-release agreement, "Well, we knew that wasn't going to work, holding your pay. We should have known better than that. And we'll just go ahead and pay you, then we'll fire you." Within 10 minutes of the conversation, Mickey Jones, the former director of CMHS's human-resources department, brought Wise his check. Jones testified that she did not withhold Wise's check and that she was never instructed to do so. Likewise, Cooper testified that he had no instruction to withhold Wise's check. Instead, Jones testified *392 that CMHS's employees normally picked up their checks from the payroll office and that Wise's check would have been available to him on May 24 if he had come to the payroll office to pick it up.
On Tuesday, May 28, Roy Crawford met with Cooper. Cooper said that Crawford volunteered to meet with Wise to talk about Wise's signing the termination-and-release agreement. Wise testified that Crawford appeared unannounced in his office on that day. After a 45-minute meeting, Wise again refused to sign the termination-and-release agreement, and he says that Crawford then told him that he was being discharged. Crawford testified that he told Wise that he was being discharged at Cooper's directive; Cooper, however, testified that he never instructed Crawford to discharge Wise and that he considered Wise to have resigned. Although the Carraway entities' interrogatory responses state that "the Board of Directors of CMHS, acting on behalf of CMHS, and as a quorum of the Board of Directors of [the Foundation], decided to terminate the employment of [Wise] if he refused to execute the termination and release documents," nothing in the record indicates that CMHS's board of directors took such action. After Wise's discharge, Cooper circulated a memorandum to CMHS's directors and managers stating that Wise had resigned and that "the Board of Directors and I certainly understand his decision to pursue other interests."
By mid-2002, CMHS had entered into an agreement with a management company that brought in a new administrator with expertise in managing troubled health-care institutions. After the meeting with Crawford on May 28, Wise proceeded with his scheduled meeting with CMHS's new administrator to advise her about CMHS's legal matters. After the meeting, Wise says he was allowed to speak with the legal staff in his office and then was asked to leave the building. On May 29, CMHS sent security personnel to his home to retrieve his company vehicle. Wise says he was allowed to return to the office on Saturday, June 1, to retrieve his personal belongings, which he found piled in the hallway next to his office.
Wise and his wife, Shirley, testified that, after he was discharged from his employment, he became depressed. Wise's physician testified that Wise suffered from situational depression as a result of being discharged from his employment, that Wise had lost 24 pounds, and that he prescribed the medications Prozac (an antidepressant) and Ambien (a sleep aid) for Wise. However, Wise visited his physician only twice because of his depression, and he was never referred to a psychiatrist or psychologist. The physician did instruct Shirley to remove all guns and ammunition from their house. Shirley testified that she would come home from work and find Wise sitting in the same chair he was sitting in when she had left for work. Wise's daughter was engaged to be married shortly after he was discharged, and because of the loss of his job, the Wises testified, they had to downsize their daughter's wedding plans. At the time Wise was discharged from his employment, his wife was working part-time for Dr. Carraway. The Wises said that it was necessary for Shirley to resign from her part-time job and obtain full-time employment at another Birmingham area hospital in order to secure health-insurance coverage for the family. Wise sought other employment, which he obtained with a temporary service, performing legal work for Alabama Power Company. While thus employed, his situational depression improved to the point that he was able to discontinue his medication. Wise also worked as a municipal judge for two small municipalities in the Birmingham area and *393 accepted court-appointed work in the Homewood Municipal Court. At the time of trial, the Wises had placed their house on the market because they were unable to make the mortgage payment.
Wise sued CMHS and the Foundation, alleging breach of contract, wrongful termination, fraud, tortious interference with a contractual relationship, civil conspiracy, and the tort of outrage. After the case had been pending for approximately one year, Wise filed a motion for a partial summary judgment on his breach-of-contract claim. The Carraway entities filed a motion for a summary judgment on all Wise's claims against them. The trial court denied Wise's motion for a partial summary judgment, but entered a summary judgment in favor of the Carraway entities as to Wise's claims of wrongful termination, tortious interference with a contractual relationship, and civil conspiracy.
The case proceeded to a jury trial on the remaining claims. All parties filed cross-motions for a JML at the close of Wise's evidence. The trial court granted the Carraway entities' motion for a JML as to Wise's fraud and tort-of-outrage claims, leaving only the breach-of-contract claim for consideration by the jury. The Carraway entities renewed a previously filed motion to preclude the jury from considering any damages for mental anguish relative to the breach-of-contract claim. At the conclusion of all the evidence, the parties renewed their motions for a JML on the breach-of-contract claim, but the trial court denied those motions.
The case was submitted to the jury on the breach-of-contract claim. The jury returned a verdict in favor of Wise for $1.5 million in compensatory damages and $500,000 in mental-anguish damages.[3] The trial court entered a judgment on the jury's verdict. The Carraway entities filed a timely postjudgment motion renewing their motion for a JML and requesting a new trial or, in the alternative, a remittitur of the damages awards. Their motion was denied by operation of law pursuant to Rule 59.1, Ala. R. Civ. P. The Carraway entities appealed; Wise then cross-appealed.

II. The Carraway Entities' Appeal (no. 1041483)

A. Whether the 2000 Contingency Contract Became Effective

We first address the Carraway entities' contention that the judgment in favor of Wise on his breach-of-contract claim is due to be reversed because, they say, his 2000 contingency contract with CMHS never became effective. The trial court held, as a matter of law, that the 2000 contingency contract was in effect at the time Wise was discharged, and it instructed the jury as follows:
"Now, this Court has removed from this jury's consideration the question of the existence or nonexistence of the contract of employment between the parties in this case, and I have ruled that there was a valid, binding agreement existing between the parties to this case at the time of the termination of [Wise's] employment by [the Carraway entities].
"Further, the written agreement dated September 1, 2000, is the contract of employment and contains the terms that govern each party's behavior thereto."
The Carraway entities argue that the trial court erred in holding that the 2000 contingency contract was effective because, *394 they allege, the condition precedent that would have been the triggering event for the contract never occurred. Specifically, the 2000 contingency contract provided that it would become "[e]ffective immediately upon the termination of Wise's employment by [the Foundation] because of the expiration of the term of the [1994] Contract as provided in Section 1 thereof...." (Emphasis added.) Section 1 of the 1994 contract provides that the contract would renew annually "unless either party on or before January 1, 1998 or any January 1 of a subsequent year, gives written notice to the other of its or his intention to terminate the Contract." The Carraway entities argue that the phrase "because of," preceding "the expiration of the term of the [1994] Contract" in the 2000 contingency contract, is restrictive and should be so construed. The Carraway entities thus maintain that because no written notice was ever given that the 1994 contract would be terminated, the condition precedentthe expiration of the term of the 1994 contractnever occurred. They assert that the trial court's holding that the 2000 contingency contract was in effect when Wise was discharged contradicts this Court's long-established rule that the words of a contract should be given their ordinary meaning and violates this Court's holding that "[t]he court will so interpret a contract as to reconcile and to enforce all of its terms and not to ignore or to disregard any of its terms so long as such an interpretation is not patently unreasonable." Bruce v. Cole, 854 So.2d 47, 55 (Ala.2003). The Carraway entities also refer us to Ex parte Cobb, 781 So.2d 208, 210-11 (Ala.2000):
"`"In negotiating a contract the parties may impose any condition precedent, the performance of which is essential before they become bound by the agreement; in other words, there may be a condition precedent to the existence of a contract. Accordingly, where the parties to a proposed contract have agreed that the contract is not to be effective or binding until certain conditions are performed or occur, no binding contract will arise until the conditions specified have occurred or been performed."'"
(Quoting Ex parte Payne, 741 So.2d 398, 403-04 (Ala.1999), quoting in turn 72 Am. Jur.2d Contracts § 34 (1991).)
Wise argues that the condition precedent was fulfilled when CMHS gave written notice to the Foundation that it was canceling the management agreement, a copy of which notice was hand-delivered to him. Wise points to Cooper's testimony that he believed that both the 1994 contract and 2000 contingency contract were valid and that he expected Wise to perform under both contracts. Wise maintains that he performed services for CMHS pursuant to the pay scale in the 2000 contingency contract and that he was paid by CMHS an amount consistent with the terms of the 2000 contingency contract.
We conclude that the 2000 contingency contract had taken effect at the time Wise was discharged. It is undisputed that Wise was on CMHS's payroll in May 2002 and that CMHS paid Wise's salary and benefits on May 24, 2002, in accordance with the 2000 contingency contract. See Industrial Machinery, Inc. v. Creative Displays, Inc., 344 So.2d 743, 746 (Ala. 1977), overruled on other grounds, Drummond Co. v. Walter Indus., Inc., 962 So.2d 753 (Ala.2006) ("[T]he waiver of contract provisions may be implied from acts and circumstances surrounding the performance of the contract."), citing Stauffer Chem. Co. v. Brunson, 380 F.2d 174, 182 (5th Cir.1967). The Carraway entities have cited no authority to overcome Wise's contention that CMHS's payment of his salary and benefits waived its right to *395 insist upon the occurrence of the condition precedent in the 2000 contingency contract. Because the 2000 contingency contract had become effective, the judgment in favor of Wise on his breach-of-contract claim is not due to be reversed on the basis that a condition precedent to its effectiveness had not occurred.

B. Whether the 2000 Contingency Contract Was Void

We next address the Carraway entities' contention that the judgment in favor of Wise on his breach-of-contract claim is due to be reversed because, they say, the 2000 contingency contract was void in that it violated the Alabama Nonprofit Act. This is a question of first impression in this Court.
It is undisputed that both of the Carraway entities were or are nonprofit corporations organized under the Alabama Nonprofit Act. The 1994 contract provided that Wise was employed as the vice president of legal affairs and general counsel of both of the Carraway entities. The 2000 contingency contract provided that Wise was employed as the vice president of legal affairs and general counsel of CMHS. Wise also served as the secretary of the Foundation's board of directors. Section 10-3A-41(a) provides:
"The officers of a corporation shall consist of a president, one or more vice-presidents, a secretary, a treasurer and such other officers and assistant officers as may be deemed necessary, each of whom shall be elected or appointed at such time, in such manner and for such terms not exceeding three years as may be prescribed in the articles of incorporation or the bylaws. In the absence of any such provision, all officers shall be elected or appointed annually by the board of directors. Each officer shall hold office for the term to which he is elected or appointed and until his successor shall have been elected or appointed. If the bylaws so provide, any two or more offices may be held by the same person, except the offices of president and secretary."
(Emphasis added.)
The Foundation's articles of incorporation do not refer to any officers for the Foundation, much less to their terms of office. Thus, according to § 10-3A-41(a), the Foundation's board of directors had to appoint or elect the Foundation's officers on an annual basis. CMHS's articles of incorporation state:
"Article IX. Officers.

"9.1 The officers of the Corporation shall be elected annually, each for a term of one year, by the members of the Board of Directors at the first regular meeting of the Board. The officers shall consist of a Chairman of the Board, a President, one or more Vice Presidents, a Secretary, a Treasurer, and such other officers and assistant officers as may be provided for in the Bylaws. If the Bylaws so provide, any one or more officers of the Corporation may be ex officio members of the Board of Directors. The officers may also be designated by such additional titles as may be provided for in the Bylaws.
"9.2 All officers shall be elected or appointed for terms of not more than one year by the Board of Directors and may be removed by the Board, all in accordance with the Bylaws."
(Emphasis added.)
The Carraway entities contend that the 1994 contract provided that Wise was to serve as vice president of legal affairs of both Carraway entities for a five-year term and that his term could automatically be extended annually without an affirmative vote of the board of directors. Likewise, the 2000 contingency contract provided *396 that Wise was to serve as vice president of legal affairs of CMHS for a five-year term and that his term could automatically be extended each year thereafter without an affirmative vote of the board of directors. The Carraway entities argue that these contracts thus violate § 10-3A-41(a), because under the Alabama Nonprofit Act the Foundation was required to elect its officers annually and because CMHS's articles of incorporation required the election of its officers annually.
In support of their argument, the Carraway entities rely upon Marx v. Lining, 231 Ala. 445, 448, 165 So. 207, 209-10 (1935), in which this Court held:
"It is established by a long line of decisions of this court that contracts specifically prohibited by law, or the enforcement of which violates the law, or the making of which violates the laws which were enacted for regulation and protection, as distinguished from a law created solely for revenue purposes, are void and unenforceable. This is the general rule. Ellis v. Batson, 177 Ala. 313, 317, 58 So. 193 [(1912)]; Sunflower Lumber Co. v. Turner Supply Co., 158 Ala. 191, 48 So. 510, 132 Am. St. Rep. 20 [(1909)]; Youngblood v. Birmingham Trust & Sav. Co., 95 Ala. 521, 12 So. 579, 20 L.R.A. 58, 36 Am. St. Rep. 245 [(1892)]; Western Union Tel. Co. v. Young, 138 Ala. 240, 243, 36 So. 374 [(1903)]; Boyett v. Standard Chemical & Oil Co., 146 Ala. 554, 41 So. 756 [(1906)]; Bowdoin v. Alabama Chemical Co., 201 Ala. 582, 79 So. 4 [(1918)]."
They also rely upon Western Union Telegraph Co. v. Young, 138 Ala. 240, 243, 36 So. 374, 375 (1905), in which this Court, quoting McGehee v. Lindsay, 6 Ala. 16, 21 (1844), stated:
"`It is not necessary that a statute should impose a penalty for doing or omitting to do something in order to make a contract void which is opposed to its operation.'
"It is sufficient if the law prohibits the doing of the act, and when it does, the court being organized under the law, and required to administer it, cannot enforce any supposed rights predicated upon a prohibited act or the omission to perform an act that is prohibited."
Thus, the Carraway entities argue, both the 1994 contract and 2000 contingency contract are void because they violate § 10-3A-41(a).
Although Wise contends that the trial court properly held that the contracts do not violate § 10-3A-41(a), he does not cite any authoritative case or statute in support of his argument. Instead, even though he acknowledges that this is "a legal issue that was properly determined by the Court (not the jury)," he argues that the facts of this case establish that the contracts do not contravene § 10-3A-41(a). Wise argues that the contracts are not illegal because Roy Crawford, outside counsel for the Carraway entities and the person who drafted the contracts, testified that he did not consider them to violate § 10-3A-41(a); because the minutes of the board of directors indicate that the board discussed the Alabama Nonprofit Act before approving the 2000 contingency contracts; because Cooper, the chairman of the board of directors and an attorney, testified that he did not consider the contracts to violate § 10-3A-41(a); because Wise had his attorney write the board explaining why the contracts did not violate § 10-3A-41(a) and the board never responded to the letter; and because it was the board's intent in entering into these contracts to retain Wise's long-term services as general counsel.
The Carraway entities further argue that the trial court erred when it refused to give their proposed jury instruction containing *397 what they contend is the controlling caselaw on this issue. In support of their argument, they cite Volkswagen of America, Inc. v. Marinelli, 628 So.2d 378, 384 (Ala.1993), in which this Court, quoting Alabama Farm Bureau Mutual Insurance Service, Inc. v. Jericho Plantation, Inc., 481 So.2d 343, 344 (Ala.1985), held: "It is a basic tenet of Alabama law that `a party is entitled to have his theory of the case, made by the pleadings and issues, presented to the jury by proper instruction,... and the [trial] court's failure to give those instructions is reversible error.'"
In concluding that the contracts did not violate the Alabama Nonprofit Act, the trial court stated:
"[Wise has] asked me to rule that the contracts made the basis of the suit, 1994 and 2000, did not violate the provisions of [the Alabama Nonprofit Act].
"And my ruling is that they do not. My ruling is that these are contracts of employment for the position as described therein. These are not positions of officer, and, indeed, fly in the face of the only testimony about Mr. Wise's position on the Board of [the Foundation], which is that he, indeed, was a member of the Board and was Secretary of the corporation.
"There's no testimony with respect to whether or not his position as Secretary was one for a period exceeding the statutory period. What we're talking about here is employment as General Counsel."
The 2000 contingency contract described Wise as "Vice President-Legal Affairs and General Counsel."[4] The contract does not delineate any responsibilities that derive solely from the title of "General Counsel" that are separate from Wise's responsibilities as "Vice President-Legal Affairs." Indeed, the 1994 contract, the predecessor to the 2000 contingency contract and the obvious model for the latter contract, was initially drafted giving Wise the title "Vice President-Legal Affairs" and including a description of the duties required of that position. When the title "General Counsel" was added to the final version, no additional duties were added. We do not here deal with two spheres of authority that can be logically divided into the functions of a corporate officer and functions discrete from the responsibilities of a corporate officer. For that reason, we cannot rely on the provision of the 2000 contingency contract calling for severability of invalid provisions.[5]
After reviewing the Alabama Nonprofit Act and the terms of the 2000 contingency contract, which we have determined was in effect at the time Wise was discharged, we conclude that the 2000 contingency contract, providing as it did for an employment term of five years as "Vice President-Legal Affairs," violated the Alabama Nonprofit Act. Accepting Wise's invitation to avoid the consequences of the limitations of the Alabama Nonprofit Act under the circumstances here presented would enable parties to disregard the limitations *398 of the Alabama Nonprofit Act with impunity. Wise's term of employment pursuant to the 2000 contingency contract is therefore limited to one year, the term to which CMHS's articles of incorporation provide that officers were to be elected annually. The breach-of-contract claim was submitted to the jury based upon a five-year term of employment, and the jury computed compensatory damages accordingly. We therefore reverse the judgment of $1.5 million in compensatory damages in favor of Wise on his breach-of-contract claim and remand this case for a new trial.[6]

C. Whether Damages for Mental Anguish Are Recoverable

We next address an issue that will be presented in a new trialthe Carraway entities' contention that the judgment in favor of Wise awarding damages for mental anguish is due to be reversed because, they argue, the trial court should not have submitted Wise's claim for mental-anguish damages to the jury. In support of their argument, they rely upon Wyatt v. Bell-South, Inc., 757 So.2d 403, 408 (Ala.2000), in which this Court, quoting Hobson v. American Cast Iron Pipe Co., 690 So.2d 341, 344 (Ala.1997),[7] stated:
"`This Court has not recognized claims for emotional distress in an employment case. In fact, it has stated: "[N]o recovery has ever been allowed for mental distress arising from the wrongful discharge of an employee in breach of an employment contract."'"
They also rely on Bowers v. Wal-Mart Stores, Inc., 827 So.2d 63, 69 (Ala.2001), in which this Court enumerated the only four exceptional types of breach-of-contract cases in which we have allowed mental-anguish damages: (1) the breach of a contract "to construct or repair, or to provide utilities to, a house where the breach impacted the habitability of the house"; (2) the breach of "contracts of carriage"; (3) the "breach of a contract to deliver a baby when the baby was stillborn"; and (4) the "breach of warranty in the sale of a `lemon,' a newly manufactured vehicle" that frequently malfunctioned despite numerous attempts at repair.[8]
The Carraway entities argue that Southern Medical Health Systems, Inc. v. Vaughn, 669 So.2d 98 (Ala.1995), is directly on point. In Vaughn, the CFO of a hospital entered into a 10-year employment contract. Three years after entering into the contract, an investigation revealed *399 that the CFO had breached his contract by purportedly committing deliberate misconduct, and the hospital's board of directors unanimously voted to terminate the CFO's employment. The CFO sued, alleging breach of contract, and a jury returned a verdict in his favor. On appeal, this Court affirmed the judgment on that verdict, holding that the evidence adduced at trial could have permitted the jury to determine that the CFO's acts of alleged misconduct were, in fact, consistent with the intent of the contracting parties. The CFO cross-appealed, contending that the trial court erred in rejecting his proffer of evidence concerning emotional damages. In affirming the judgment as to the cross-appeal, this Court stated:
"Vaughn asks us to remand this cause to the trial court `solely for retrial on the mental anguish issue.' ... In doing so, however, he concedes that this Court has never recognized a rule authorizing the recovery of damages for mental distress caused by the breach of an employment contract. See Slovensky v. Birmingham News Co., 358 So.2d 474, 477 (Ala.Civ.App.1978) ('no recovery has ever been allowed for mental distress arising from the wrongful discharge of an employee in breach of an employment contract'). We decline to recognize such a rule in this case."
669 So.2d at 101.
Wise refers us to the following discussion in Bowers:
"`The ground on which the right to recover such damages [for mental anguish] is denied, is that they are too remote, were not within the contemplation of the parties, and that the breach of the contract is not such as will naturally cause mental anguish. "Yet where the contractual duty or obligation is so coupled with matters of mental concern or solicitude, or with the feelings of the party to whom the duty is owed, that a breach of that duty will necessarily or reasonably result in mental anguish or suffering, it is just that damages therefor be taken into consideration and awarded."'"
827 So.2d at 68-69 (quoting F. Becker Asphaltum Roofing Co. v. Murphy, 224 Ala. 655, 656, 141 So. 630, 631 (1932)). He also contends in his brief that damages for mental anguish are available "when the contract is `predominantly personal in nature,'" relying upon Dorsey v. Purvis, 543 So.2d 703, 704 (Ala.Civ.App.1989), in which the Court of Civil Appeals quoted the following from 7A C.J.S. Attorney and Client § 273a (1987), as it relates to attorney and client relationships: "`There can be no recovery for emotional distress, where [the legal malpractice] does not involve any affirmative wrongdoing but merely neglect of duty, and the client may not recover for mental anguish where the contract which was breached, was not predominantly personal in nature.'"; and upon Boros v. Baxley, 621 So.2d 240, 244 (Ala.1993), in which this Court noted the foregoing statement from C.J.S. in Dorsey.
Wise argues that this Court should affirm the judgment awarding damages for mental anguish because, he argues, this case "involves the long-term, written and personal employment contract of a long time valuable and loyal employee." He asserts that he worked for the Carraway entities for 30 years, that he always received exemplary reviews, and that he "was made the subject of a process of intimidation and duress to attempt to get him to sign a complete Release of [the 2000 contingency] contract and become an insecure employee at-will." He contends that his position is supported by the evidence, which showed that CMHS withheld his last check in an attempt to force him to sign the termination-and-release agreement, that he was excluded from board *400 meetings, that his signature as secretary was forged to board minutes, and that CMHS discharged him when he refused to sign the termination-and-release agreement at its insistence. He also argues that mental-anguish damages are warranted because, he says, he and his family had "a close personal and professional relationship[]" with the Carraway entities and that his superiors knew of his financial situation and his need for continued employment. He further argues that the mental anguish he suffered was not remote and that it was clearly foreseeable by the Carraway entities. Therefore, he contends that his should be "the case" in which this Court recognizes the availability of damages for mental anguish caused by the breach of an employment contract. Wise distinguishes Wyatt v. BellSouth on the basis that Wyatt involved an at-will employment situation. He distinguishes Southern Medical Health Systems v. Vaughn on the basis that the board of directors in Vaughn believed that it had cause to terminate the CFO's employment.
The trial court held that mental-anguish damages were available to Wise:
"If there's nothing further, this Court is persuaded by the facts that I've heard in this case, and those facts are uncontroverted that [Wise] was a dedicated, loyal, and excellent worker for a number of years.
"The Court's persuaded by the testimony that he was a personal friend of Mr. Cooper, personal friend of [Thomas] Roberts [a member of CMHS's board of directors], that everybody close to [Wise], either on the Board or otherwise associated with Carraway, understood and knew the pending marriage of his daughter.
"Everybody knew and understood ... that he did things social in nature with members of the Board. All of that has been acknowledged by everybody.
"And this Court is persuaded that given these uncontroverted facts that it was certainly within or should have been within the knowledge and thoughts of the people that such a devastating blow to someone's ability to earn would result in [what] we have heard in this case that Mr. Wise suffered.
"And this just very well may be that case because it cries out loud to this judge that the mental anguish that was presented ... here was a direct result of the breach of what this Court finds to be a valid and binding employment agreement between [Wise] and [the Carraway entities].
"So, I'm going to overrule the motion [for a JML], and there will be two claims. One for breach of contract and compensatory damages that flow therefrom, as well as a claim for mental anguish, which I will explain and use my pattern jury instruction 10.28 to discuss with the jury."
Reviewing the evidence presented, we note that as general counsel for the Carraway entities, Wise was fully aware of the financial crises those entities faced and of the cost-cutting measures they found it necessary to consider. Although a jury could view the manner in which Wise was discharged as neither tactful nor professional, as a businessman and lawyer, Wise should have been aware that his position was not as secure as he might have previously thought when he was presented with the termination-and-release agreement. Based upon all the facts and circumstances presented here, we do not consider this to be "the case" in which we should recognize the availability of mental-anguish damages arising out the breach of an employment contract. Therefore, we reverse the judgment entered on the verdict awarding *401 $500,000 in compensatory damages attributed to mental anguish.

III. Wise's Cross-Appeal (no. 1041545)

We now turn to Wise's cross-appeal. Wise argues that the Carraway entities were not entitled to a JML as to his tort-of-outrage claim. He relies on American Road Service Co. v. Inmon, 394 So.2d 361, 365 (Ala.1981), in which this Court first recognized the tort of outrage, stating:
"[O]ne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress and for bodily harm resulting from the distress. The emotional distress thereunder must be so severe that no reasonable person could be expected to endure it. Any recovery must be reasonable and justified under the circumstances, liability ensuing only when the conduct is extreme. Comment, Restatement [(Second) of Torts, § 46 (1948)], at 78. By extreme we refer to conduct so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society."
Wise argues that the Carraway entities' actions meet the requirements established in Inmon for the tort of outrage because, he says: (1) he was a dedicated, excellent employee of the Carraway entities; (2) he had a long-term employment contract to assure the heritage and link with the future of CMHS; (3) CMHS's board of directors knew that he had a valid employment contract; (4) he performed under the contract; (5) the Carraway entities did not perform pursuant to the contract and, in seeking his execution of the termination-and-release agreement, wanted Wise's consent to breach the employment contract; (6) Cooper sent Crawford to do his "dirty work" because Wise would not sign the termination-and-release agreement; (7) Wise was told that he was being discharged immediately preceding a meeting with CMHS's new administrator; (8) he was asked to leave the premises immediately following the meeting with the new administrator and was not allowed to say goodbye to his coworkers; (9) he was not allowed to remove his personal belongings from his office until the Saturday after he was discharged, and when he went to the office on that Saturday he found his belongings piled outside his office door; (10) Dr. Carraway had contracts similar to Wise's 1994 contract and 2000 contingency contract, and he received a severance package worth $1.2 million upon being discharged as CMHS's CEO; (11) at the time he was discharged, Wise was 50 years old with a daughter about to get married; (12) his wife had to return to work full-time so the family could have health-insurance coverage; (13) he lost 24 pounds and had to take medication for his depression and weight loss; and (14) his depression was so severe that his physician advised his wife to remove all guns and ammunition from the house.
The Carraway entities note that the tort of outrage is an extremely limited cause of action that this Court has held may be submitted to a jury only in the most egregious of circumstances. They point out that this Court has recognized the tort of outrage in only three limited circumstances: (1) wrongful conduct within the context of family burials; (2) an insurance agent's coercing an insured into settling an insurance claim; and (3) egregious sexual harassment. The Carraway entities also point out that in order to establish a successful tort-of-outrage claim, a plaintiff must show that "the defendant's conduct caused emotional distress so severe that no reasonable person could be expected to *402 endure it." Stabler v. City of Mobile, 844 So.2d 555, 560 (Ala.2002). They argue that the there is no evidence indicating that Wise sustained emotional distress so severe that no reasonable person could have been expected to endure it.
Reviewing the evidence presented, we recognize that being discharged from his employment was certainly a personal crisis for Wise, a professional who had devoted his entire career to a company that decided it no longer needed his services. Based upon all the facts and circumstances presented here, we do not consider Wise's discharge to be so shocking that it goes "beyond all possible bounds of decency" so that it must "be regarded as atrocious and utterly intolerable in a civilized society," Inmon, 394 So.2d at 365, and we decline to expand the operation of the tort of outrage to encompass the breach of this employment contract. Therefore, we affirm the judgment entered in favor of the Carraway entities as to Wise's tort-of-outrage claim.

IV. Conclusion

Because Wise's tort-of-outrage claim and his demand for mental-anguish damages allowed evidence to be admitted during this trial that would not have been otherwise admissible to support a breach-of-contract claim, we cannot simply order a remittitur of the compensatory damages for the Carraway entities' breach of the 2000 contingency contract in excess of one year or a remittitur of the mental-anguish-damages award. We therefore affirm the judgment entered in favor of the Carraway entities as to Wise's tort-of-outrage claim, reverse the judgment entered in Wise's favor as to his breach-of-contract claim, and remand the case for a new trial consistent with this opinion. Because we reverse the judgment entered in favor of Wise in its entirety and remand the case for a new trial, we pretermit consideration of the other arguments presented by the Carraway entities on appeal.
1041483REVERSED AND REMANDED.
SEE, WOODALL, STUART, SMITH, and PARKER, JJ., concur.
COBB, C.J., and BOLIN, J., concur in part and dissent in part.
MURDOCK, J., concurs in part, dissents in part, and concurs in the result in part.
1041545AFFIRMED.
COBB, C.J., and SEE, WOODALL, STUART, SMITH, BOLIN, PARKER, and MURDOCK, JJ., concur.
COBB, Chief Justice (concurring in part and dissenting in part).
I concur with Part II.A. of the majority opinion, which holds that the 2000 contingency contract had taken effect at the time Wise was discharged; I also concur with Part III of the majority opinion, which holds that the Carraway entities were entitled to a judgment as a matter of law as to Wise's tort-of-outrage claim; however, I respectfully dissent from the remainder of the majority opinion. I join Justice Bolin's dissent as to Part II.B. of the majority opinion; however, I write to explain why I would have upheld the damages award for mental anguish on Wise's breach-of-employment-contract claim and why I therefore must dissent as to Part II.C.
As the majority notes, Carraway directed this Court's attention to Hobson v. American Cast Iron Pipe Co., 690 So.2d 341, 344 (Ala.1997), in which this Court stated:
"This Court has not recognized claims for emotional distress in an employment case. In fact, it has stated: `[N]o recovery has ever been allowed for mental distress arising from the wrongful discharge *403 of an employee in breach of an employment contract.' Southern Medical Health Systems, Inc. v. Vaughn, 669 So.2d 98 (Ala.1995)."
I believe this statement in Hobson to be incorrect. In Birmingham-Jefferson County Transit Authority v. Arvan, 669 So.2d 825 (Ala.1995), Arvan, the plaintiff, sued the Authority alleging conversion of his pen-and-pencil set and a computer program he was developing, as well as breach of an employment contract. The evidence at trial was conflicting, but this Court stated that the evidence, when viewed most favorably toward Arvan, indicated the following:
"1) that Arvan was experienced in the management of maintenance departments within mass transit systems; 2) that the Authority was in need of a manager to resolve certain problems within its maintenance department; 3) that the Authority's general manager made a written offer to Arvan to provide him with `full-time permanent employment' (see Harrell v. Reynolds Metals Co., 495 So.2d 1381 (Ala.1986), stating that this Court has interpreted the term 'permanent employment,' as used in employment contracts, to be synonymous with lifetime employment); 4) that the general manager offered Arvan employment under very generous terms in order to entice Arvan to go to work for the Authority; 5) that the general manager orally promised Arvan that, if he would `take [the] job and ... straighten [the maintenance department] out,' he would `guarantee [him] a job for life'; 6) that the general manager answered only to the Authority's board of directors and that he `[had] the authority or consent of [his] superiors' to make the particular offer that he made to Arvan (see Harrell v. Reynolds Metals Co., supra, discussing the authority necessary for an agent to bind the principal to a lifetime employment contract); 7) that Arvan gave up a job opportunity in California in order to accept the Authority's offer (see Bates v. Jim Walter Resources, Inc., 418 So.2d 903 (Ala.1982), stating that the relinquishment of prior employment may constitute sufficient consideration for a lifetime employment contract); 8) that Arvan performed satisfactorily in his position with the Authority and that at the time of his discharge he was ready, willing, and able to continue to perform his duties there; 9) that his discharge occurred because of personal differences he developed with the general manager, not because of necessary cutbacks in personnel or other reasons that would constitute just cause of a discharge (see Bates v. Jim Walter Resources, Inc., supra, stating that even a `permanent' employee can be discharged for cause); and 10) that Arvan was damaged as a result of his discharge."
669 So.2d at 827. The jury awarded Arvan $685,000 in compensatory damages and $400,000 in punitive damages; however, the trial court granted the Authority's motion for a judgment notwithstanding the verdict (now a renewed motion for a judgment as a matter of law, see Rule 50, Ala. R. Civ. P.) as to the punitive-damages award.
On appeal, the Authority raised six issues, one of which was "[w]hether the damages award was supported by the evidence." 669 So.2d at 827. As to this issue, Justice Houston, writing for the Court, stated:
"With respect to the sixth and final issue, we note that the evidence indicated that Arvan was 47 years old when he was discharged; that he was earning an annual salary at that time of approximately $50,000; that his pen and pencil set was valued at approximately $1,000; that his computer program, if marketed, *404 was valued at between $2,000 and $8,000 per copy; and that he had suffered mental anguish as a result of his discharge. (The jury was instructed, without objection, that it could award damages for mental anguish if it found for Arvan on his contract claim.) Based on this evidence, we conclude that the jury's award of compensatory damages was not unreasonable."[9]
669 So.2d at 829 (emphasis added). Thus, precedent exists in Alabama for awarding damages for mental anguish in a breach-of-employment-contract claim.
The majority refers to the Carraway entities' actions regarding Wise as "neither tactful nor professional." 986 So.2d at 400. The trial judge, who observed the live testimony at trial, found the actions of the Carraway entities to be somewhat more egregious. In overruling the Carraway entities' motion for a judgment as a matter of law, the trial judge stated:
"If there's nothing further, this Court is persuaded by the facts that I've heard in this case, and those facts are uncontroverted that [Wise] was a dedicated, loyal, and excellent worker for a number of years.
"The Court's persuaded by the testimony that he was a personal friend of Mr. Cooper, personal friend of [Thomas] Roberts [a member of CMHS's board of directors], that everybody close to [Wise], either on the Board or otherwise associated with Carraway, understood and knew the pending marriage of his daughter.
"Everybody knew and understood ... that he did things social in nature with members of the Board. All of that has been acknowledged by everybody.
"And this Court is persuaded that given these uncontroverted facts that it was certainly within or should have been within the knowledge and thoughts of the people that such a devastating blow to someone's ability to earn would result in [what] we have heard in this case that Mr. Wise suffered.
"And this just very well may be that case because it cries out loud to this judge that the mental anguish that was presented ... here was [a] direct result of the breach of what this Court finds to be a valid and binding employment agreement between [Wise] and [the Carraway entities]."
In addition to the aforementioned facts outlined by the trial judge, it should be noted that CMHS's chief executive officer, Dr. Robert Carraway, grandson of the founder of CMHS, had entered into contracts almost identical to the contracts between Wise and the Carraway entities and that Dr. Carraway's contract was purchased by CMHS for over $1.2 million, and he was allowed to remain as chairman of CMHS's board. The majority bases its rationale for reversing the award of damages for mental anguish on the fact that Wise was "a businessman and lawyer" who "should have been aware that his position was not as secure as he might have previously thought when presented with the termination-and-release agreement." 986 So.2d at 400. Although that fact does give me pause for thought, I do not believe that it creates an absolute bar to the award of damages for mental anguish. Instead, it is a fact the jury could have, and may have, considered in determining its award of mental-anguish damages.
*405 Today's ruling regarding mental-anguish damages sheds light on a fundamental flaw in our established caselaw regarding damages for mental anguish in a breach-of-contract action. In Bowers v. Wal-Mart Stores, Inc., 827 So.2d 63, 68 (Ala.2001), this Court, observing that "[a]n award of damages for mental anguish generally is not allowed in breach-of-contract actions in Alabama," noted four exceptions to this general prohibition: (1) breaches of "contracts to construct or repair, or to provide utilities to, a house where the breach impacted the habitability of the house"; (2) breaches of "contracts of carriage"; (3) "breach of a contract to deliver a baby, when the baby was stillborn"; and (4) "breach of warranty in the sale of a `lemon,' a newly manufactured car that frequently broke down at intersections." 827 So.2d at 69. But for the exception this Court has allowed for the recovery of mental anguish on a breach-of-contract claim involving a stillborn infant, I cannot honestly say that the facts surrounding Wise's dismissal were less egregious and would cause less mental anguish than those limited instances where this Court has permitted the recovery of damages for mental anguish. Yet that is exactly what the majority has held.
When exceptions are made to a general rule of law, inconsistent and illogical results can and do occur. Two years ago, the Supreme Court of Mississippi considered a case presenting a similar dilemma and clarified the burden required for the recovery of mental-anguish damages in a breach-of-contract action. In University of Southern Mississippi v. Williams, 891 So.2d 160 (Miss.2005), the Supreme Court of Mississippi held:
"This Court traditionally has held that emotional distress and mental anguish damages are not recoverable in a breach of contract case in the absence of a finding of a separate independent intentional tort. Life & Cas. Ins. Co. v. Bristow, 529 So.2d 620, 624 (Miss.1988). In recent years, however, this Court has moved away from this requirement. See Southwest Miss. Reg'l Med. Ctr. v. Lawrence, 684 So.2d 1257, 1269 (Miss. 1996). It is now undisputed that under Mississippi law a plaintiff can assert a claim for mental anguish and emotional distress in a breach of contract action. However, our decisions over the past several years addressing mental anguish and emotional distress are arguably unclear. On the one hand, we have held that we require a heavy burden of proof in order to establish a right to recover emotional distress damages. Wilson v. Gen. Motors Acceptance Corp., 883 So.2d 56, 64-65 (Miss.2004). On the other hand, we have allowed recovery for mental anguish based upon the following testimony:
"`Lawrence's proof for her claim for damages for mental anguish included her testimony at trial that she was "devastated" as a result of the denial of benefits and termination of employment. Lawrence stated that she was worried about where she would get the money to cover the basic household expenses. She also testified that she and her family lost their home as a result of the denial of benefits and termination of employment.'

"Southwest Miss. Reg'l Med. Ctr. v. Lawrence, 684 So.2d at 1269.
"We take this opportunity to clarify the burden for recovery of mental anguish and emotional distress in breach of contract actions. Plaintiffs may recover such damages without proof of a physical manifestation. Adams v. U.S. Homecrafters, Inc., 744 So.2d 736, 743 (Miss.1999). Furthermore, expert testimony showing actual harm to prove mental injury is not always required. *406 Gamble v. Dollar Gen. Corp., 852 So.2d 5, 11 (Miss.2003). However, the plaintiff must show (1) that mental anguish was a foreseeable consequence of the particular breach of contract, and (2) that he or she actually suffered mental anguish. Such generalizations as `it made me feel bad,' or `it upset me' are not sufficient. A plaintiff must show specific suffering during a specific time frame. These requirements are not different from the requirements to establish physical pain and suffering.
"We have previously held that, `evidence consisting solely of a claim of sleeplessness and mental anguish did not demonstrate an actual injury with sufficient certainty to warrant compensation.' Morrison v. Means, 680 So.2d 803, 806-07 (Miss.1996). We then clarified this holding in Whitten v. Cox, 799 So.2d 1, 10-11 (Miss.2000), by pointing out that testimony concerning `discomforts' such as sleeplessness and irritability take on a different importance when viewed in light of the event which engendered the mental anguish. In Whitten, we recognized greater significance to such terms because of the event8 which caused them.
"Thus, `the nature of the incident' can be important in two ways. First, understanding the nature of the incident is essential in establishing whether emotional distress is foreseeable. Additionally, in cases where the defendant's conduct is more egregious, the plaintiff's burden of establishing specific proof of suffering will decrease. Nevertheless, the burden is there, and a plaintiff seeking emotional distress damages for a breach of contract must provide more than general declarations of emotional distress.
"8 The plaintiffs received death threats from an armed man who shot at their vehicle, handcuffed them, and took them prisoner."
891 So.2d at 172-73. I would follow Mississippi's example and use the opportunity presented by this case to clarify the burden required to recover damages for mental anguish in a breach-of-contract action.
Given the egregiousness and callousness of the actions of the Carraway entities, I would affirm the award of mental-anguish damages here. I therefore dissent as to that part of the majority opinion.
BOLIN, Justice (concurring in part and dissenting in part).
I concur in the main opinion, with the exception of Part II.B., from which I respectfully dissent.
Part II.B. holds that the 2000 contingency contract can be enforced for a period of only one year because the Alabama Nonprofit Act, § 10-3A-1 et seq., Ala.Code 1975, limits the term of a vice president, under the facts presented here, to one year. I agree that, pursuant to § 10-3A-41(a), Ala.Code 1975, "a president, one or more vice-presidents, a secretary, a treasurer and such other officers and assistant officers as may be deemed necessary" for the Foundation to operate would be bound by the one-year term-of-office proscription for corporate officers found in that section; CMHS's articles of incorporation also had a one-year term limitation for CMHS's officers. However, there is no requirement in the Alabama Nonprofit Act or CMHS's articles of incorporation that there actually be a "Vice President-Legal Affairs," just as there is no provision that there has to be a general counsel. The Carraway entities, however, agreed with Wise that, as embodied in both the 1994 contract and the 2000 contingency contract, there would be both. The 1994 contract *407 as initially proposed, drafted not by Wise but rather by Roy Crawford, outside counsel for the Carraway entities, proposed employing Wise as a vice president of legal affairs. Wise countered by specifically adding the position and title of general counsel, a status he had attained in 1992, to the contract. The addition of the previously earned title of general counsel to the contract could hardly have been overlooked by the Carraway entities, because it was one of only three changes made by Wise to the proposed contract prepared by the Carraway entities through their own outside counsel.
The duties and responsibilities of vice president of legal affairs and the duties and responsibilities of general counsel of a corporation can well overlap, even to the point of synonymity, but they can also be different. The main opinion correctly points out that the stated duties attendant to Wise's position in the 1994 contract were not added to, or changed, when Wise insisted that the position and title of general counsel be added. However, nothing in the record shows that the responsibility as originally described in the draft 1994 contract did not already include work to be performed as general counsel, just as the trial judge explained when he stated: "What we're talking about here is employment as General Counsel." Indeed, Wise had already been functioning as general counsel for two years before the execution of the 1994 contract, and there is nothing additional in the record to show that Wise's duties changed at all after the 1994 contract was executed.
A vice president of legal affairs could have authority dealing with legal matters for a nonprofit health-care facility operating as a hospital that can be hugely encompassing. Such an officer could have responsibilities dealing with billing and the collection of accounts, preventing malpractice actions, implementing human-resource policies from a legal perspective, employing outside counsel, and many other areas of responsibility within the legal realm that could be bounded only by the necessities of the corporation. Such an officer would not necessarily require a license to practice law, if that officer had general responsibility over legal matters for the corporation without engaging in the actual practice of law. In contrast, a corporate general counsel is almost self-defined as being the in-house attorney for the corporation. General counsel is defined by Black's Law Dictionary to be "[t]he most senior lawyer in a corporation's legal department, usu[ally] also a corporate officer." Black's Law Dictionary 374-75 (8th ed.2004) (emphasis added). Wise was elected and held status as a "Vice President-Legal Affairs," but he was first, and continued to be, general counsel for the Carraway entities.
I see no prohibition in the Alabama Nonprofit Act to a nonprofit corporation's entering into a multi-year agreement with its general counsel. Wise was general counsel for the Carraway entities, both before and after the execution of the written employment contracts. Whether this should be a vehicle that enables nonprofit corporations to disregard the limitations of the Alabama Nonprofit Act with impunity is a matter for legislative redress, but it should not bar Wise's recovery for compensation owed him as general counsel under the 2000 contingency contract. Therefore, I dissent as to this Court's holding in Part II.B. of the main opinion. I would, however, remand the case to the trial court to determine what portion of Wise's compensation was attributable, under the full duration of the 2000 contingency contract, to his services as general counsel.
COBB, C.J., concurs.
*408 MURDOCK, Justice (concurring in part, dissenting in part, and concurring in the result in part).
I respectfully dissent as to Part II.B. of the main opinion. I largely agree with Justice Bolin's special writing. I believe Wise's contract did not violate § 10-3A-41(a), Ala.Code 1975, insofar as it governed Wise's status as an employee. I would remand the cause for a new trial as to the damages caused to Wise in that regard.
I otherwise concur in the main opinion, except for Part II.C., as to which I concur in the result.
NOTES
[1] This case has previously been assigned to other Justices on this Court. It was reassigned to Justice Lyons on September 25, 2007.
[2] Wise testified that employees of CMHS were normally paid on the 25th of each month. Because May 25, 2002, was a Saturday, employees were paid on May 24.
[3] The verdict form distinguished the damages as "compensatory damages" and "mental anguish."
[4] We are not confronted with separate contracts describing separate responsibilities.
[5] The 2000 contingency contract contained a provision entitled "Severability." That provision states:

"Should any court of competent jurisdiction decide, hold, adjudge or decree that any provision, paragraph, clause or term of this Contract is void or unenforceable, in whole or as applied in a particular situation, such determination shall not affect any other provision of this Contract, and all other provisions of this Contract shall remain in full force and effect in such situation, and all provisions of this Contract shall remain in full force and effect in any and all other situations."
[6] For the reasons set forth in Part IV of this opinion, "Conclusion," a remittitur as an alternative to a new trial is not appropriate here.
[7] As the Chief Justice points out in her special writing, the statement quoted from Hobson v. American Cast Iron Pipe Co.that this Court has never allowed the recovery of an award of mental-anguish damages in a setting where an employee has alleged his or her wrongful discharge in the breach of an employment contractis not totally accurate. A more correct statement would recognize that this Court has never affirmed an award of mental-anguish damages in an employment setting where the breach-of-an-employment-contract issue had been properly preserved and was decided on appeal in favor of the employee.
[8] The Carraway entities also argue that both the 1994 contract and the 2000 contingency contract provided that "the non-breaching party shall be limited to damages and specific performance as exclusive remedies." Thus, they contend, neither the 1994 contract nor the 2000 contingency contract provided for emotional or mental-anguish damages. However, the Carraway entities make this argument for the first time on appeal; we therefore do not consider it. "`This Court cannot consider arguments raised for the first time on appeal; rather, our review is restricted to the evidence and arguments considered by the trial court.'" Marks v. Tenbrunsel, 910 So.2d 1255, 1263 (Ala.2005) (quoting Andrews v. Merritt Oil Co., 612 So.2d 409, 410 (Ala. 1992)).
[9] No objection to the jury charges regarding mental anguish was interposed in Arvan, thus making the appropriateness of damages for mental anguish a nonissue. Nevertheless, it would still be inaccurate to say that this Court has never upheld the award of mental-anguish damages in a breach-of-employment-contract action.